COMMONWEALTH OF MASSACHUSETTS
BUSINESS LITIGATION SESSION

SUFFOLK, ss.

SUPERIOR COURT
C.A. No. 03-2012 BLS
(van Gestel, J.)

```
------------------------------------------------------------ X
                                                             :
TIMOTHY P. KING, attorney in fact for and on behalf
of HILDA AYER ANDERSON, and the AYER-                        :
ANDERSON FOUNDATION, INC.
                                                             :
        Plaintiffs,
                                                             :
    v.
                                                             :
JON F. CONANT, ROBERT E. SAYRE, and
BERTRAM W. ALLEN                                             :

        Defendants.                                          :
                                                             :
------------------------------------------------------------ X
```

## FIRST AMENDED COMPLAINT

### INTRODUCTION

By this action, Timothy P. King, on behalf of his mother, Hilda Ayer Anderson ("Mrs. Anderson"), and the Ayer-Anderson Foundation, Inc. ("the Foundation") seek recovery of in excess of $5,000,000 stolen, mismanaged, and/or wasted by Mrs. Anderson's attorney, defendant Jon F. Conant ("Conant"), her psychologist, defendant Robert E. Sayre ("Sayre"), her former counsel, defendant Bertram A. Allen, and former defendant John Byors, an individual who conspired with Conant and participated in phony loan transactions to defraud plaintiffs. Mrs. Anderson is 79 years old, has a long history of suffering from physical and personal problems, and is not capable of managing her financial affairs. Prior to 1990, Mrs. Anderson's brother Neil

Ayer managed Mrs. Anderson's finances.

After the death of Mr. Ayer in 1990, defendants Allen, Conant and Sayre insinuated themselves into the financial affairs of Mrs. Anderson and the Foundation. Specifically, Messrs. Conant, Sayre and Allen secured powers of attorney over Mrs. Anderson, were appointed trustees of Mrs. Anderson's various trusts and officers of the Foundation, and/or secured signatory authority on the bank accounts of Mrs. Anderson and the Foundation. Thereafter, in breach of their fiduciary and professional responsibilities, defendants systematically misappropriated funds from Mrs. Anderson and the Foundation for their personal benefit.

As described in detail below, defendants also defrauded plaintiffs through various schemes, including a $500,000 investment in a purported Vermont marble quarry, a below market sale of plaintiffs' waterfront property, and by securing health insurance and pension benefits at plaintiffs' expense and without their knowledge.

By this action, plaintiffs seek recovery of damages against defendants for breach of fiduciary and contractual duties, fraud, negligence, professional malpractice, conversion and violations of M.G.L. c. 93A. Plaintiffs also seek declaratory and equitable relief, including an accounting of all assets of Mrs. Anderson and the Foundation, and the immediate return of all client files by Conant and Allen pursuant to Rule 1.16 of the Massachusetts Rules of Professional Conduct. To secure plaintiffs' likely judgment and preserve the damages remedy, plaintiffs also seek trustee process, real estate attachments, and an asset freeze against defendants Conant and Sayre.

Since filing this action, plaintiffs have discovered additional facts and circumstances from documents turned over by defendant Conant and documents from accountants hired by Conant

2

concerning the professional malpractice committed by both Conant and Sayre. As detailed below, Conant – a real estate closing lawyer – was woefully ill equipped to serve as the attorney or fiduciary for Mrs. Anderson or her charity. Armed with complete and unfettered control over plaintiffs' finances, Conant committed professional malpractice by, among other things, failing to institute even a rudimentary record keeping system of plaintiffs' funds, failing to budget for Foundation or personal expenses, failing to delineate between Mrs. Anderson's expenses and the Foundation's, exercising no reasonable judgment to limit costs to a sustainable level, and failing to implement any tax or estate planning strategies. Instead, Conant burned through over $10,000,000 of Mrs. Anderson's funds – ultimately forcing her to close her Foundation and sell her property.

Sayre grossly abused his position as Mrs. Anderson's therapist. In violation of the canons of ethics, in breach of his fiduciary duties, and instead of acting as Mrs. Anderson's psychologist, Sayre apparently spent most of his time as Mrs. Anderson's concierge, running errands, hanging around the pool, and performing undocumented "administrative services." Sayre also took lavish gifts, such as automobiles and cash payments, while securing for himself outrageous benefits, such as a $150,000 salary, free health care, and a $30,000 yearly pension. Between 1996 and 2002 alone, Sayre took over $900,000 from plaintiffs in the form of salary, fees for purported therapy sessions, health insurance, and other pension benefits. Sayre also regularly sat in on Foundation meetings, chaired by Conant, and participated in business decisions. In sum, Sayre, like Conant, breached his professional responsibilities for personal gain, and took advantage of a patient he was charged to heal, not bilk.

3

## PARTIES

1.     Timothy P. King is the attorney in fact of his mother, Hilda Ayer Anderson, who resides at 33 Sleepy Hollow Road, Gloucester, Massachusetts.

2.     Plaintiff Ayer-Anderson Foundation, Inc. is a Massachusetts non-profit corporation located at 147 Wingaersheek Road, Gloucester, Massachusetts. In April 1992, Mrs. Anderson founded the Frederick Ayer Foundation, Inc., which later changed its name to the Ayer-Anderson Foundation, Inc. The Foundation was established to provide at no cost an indoor swimming pool to the disabled, elderly and Head Start program members for exercise, physical therapy, and recreation. The Foundation's original board members consisted of Mrs. Anderson, her husband Paul Anderson, and the defendant Allen. Allen also was the Foundation's clerk. Defendant Conant later was appointed a director and clerk of the Foundation.

3.     Defendant Jon F. Conant is an attorney admitted to practice in the Commonwealth of Massachusetts with a residence at 71 High Street, Gloucester, Massachusetts.

4.     Defendant Robert Sayre is a psychologist licensed to practice in the Commonwealth of Massachusetts with a residence at 4 Andrews Hollow, Rockport, Massachusetts.

5.     Defendant Bertram W. Allen is an attorney admitted to practice in the Commonwealth of Massachusetts with a residence at 1514 Oxford Street, Berkeley, California, 94709.

6.     Trustee Process defendants Sovereign Bank with an address at 154 Main Street, Gloucester, Massachusetts 01930, Beverly National Bank with an address at 240 Cabot Street,

4

Beverly, Massachusetts 01915, Ipswich Co-operative Bank with an address at 2 Depot Square, P.O. Box 32, Ipswich, Massachusetts 01938, Fleet Bank NA with an address at 100 Federal Street, Boston, Massachusetts 02110, Citizens Bank with an address at 28 State Street, Boston, Massachusetts 02109, First and Ocean National Bank with an address at 51 State Street, Newburyport, Massachusetts 01950, and Rockport National Bank with an address at 16 Main Street, Rockport, Massachusetts 01966 are banking institutions with offices in Suffolk or Essex County, Massachusetts, and are named herein only to the extent that they have possession or control of funds, goods, effects, credits or other assets of the defendants Conant and Sayre.

## FACTS

### Background

7.     Mrs. Anderson is 79 years old, has suffered for many years from serious physical and personal problems, and is incapable of managing her own financial affairs.  As a result, Mrs. Anderson necessarily has relied upon fiduciary advisors to manage her finances.  Mrs. Anderson's income is derived primarily from two sources. First, Mrs. Anderson is a beneficiary of certain irrevocable trusts, from which she is entitled to the income, but not principal (the "Irrevocable Trusts").  In addition, Mrs. Anderson is a beneficiary of the Hilda A. Curtis Revocable Trust, dated November 11, 1961, from which the trustees are empowered to make payments of both interest and principal for Mrs. Anderson's benefit (the "Revocable Trust").

8.     Prior to 1990, Mrs. Anderson's brother Neil Ayer oversaw her financial affairs. As of the time of Mr. Ayer's death in 1990, Mrs. Anderson's Revocable Trust was valued at in excess of $5,000,000, and produced income of almost $200,000 per year.  In addition, Mrs. Anderson was receiving income from the Irrevocable Trusts in excess of $400,000 per year.

5

## Misappropriation of Funds By Defendants Allen, Conant and Sayre

9.    After the death of Mr. Ayer in 1990, defendants Allen, Conant and Sayre

insinuated themselves into the financial affairs of Mrs. Anderson and the Foundation. In

November 1992, Mrs. Anderson executed a general durable power of attorney for the benefit of

Allen. The power of attorney granted Allen complete authority over Mrs. Anderson's financial

affairs. Allen also served as a trustee of the Revocable Trust.

10.    In 1992, defendant Conant secured from Mrs. Anderson a general power of

attorney in his favor. In 1993, Conant also secured signing authority over the checking accounts

of Mrs. Anderson and the Foundation. Conant also was appointed a trustee of the Revocable

Trust. Conant also kept all the plaintiffs' financial books and records and performed the

"bookkeeping."

11.    In breach of their fiduciary and professional responsibilities, defendants

systematically misappropriated funds from Mrs. Anderson and the Foundation for their personal

benefit. For example, between January 2001 and February 2003 alone, Conant issued checks to

himself from plaintiffs' bank accounts totaling over $700,000.

12.    Defendant Sayre, a psychologist, counseled Mrs. Anderson and, remarkably, also

insinuated himself into her financial affairs. Somehow, Sayre also was appointed a trustee of the

Revocable Trust.

13.    By 2003, without plaintiffs' knowledge, Conant was paying Sayre from plaintiffs'

accounts an annual salary and other payments in excess of $200,000 per year, including a

$36,000 yearly "pension." Specifically, in September 2001, Conant prepared and signed a "Split

Dollar Agreement" for Sayre whereby the Foundation made monthly payments to an account

6

established at New England Life Insurance Company for Sayre's benefit. Sayre's "pension" was drawn from the Foundation's bank account with automatic withdrawals of approximately $3,000 per month.

14.    In addition, without plaintiffs' knowledge and at their expense, Conant added himself and his family as well as Sayre and his family to the Foundation's Blue Cross health insurance plan. When Conant's name was recently uncovered as an insured on the Blue Cross policy, he claimed that he would reimburse the Foundation for the health insurance cost.

### Conant's Sale of 143-145 Wingaersheek Road

15.    In December 1992, at the direction of Conant and Allen, the Foundation purchased property located at 143-145 Wingaersheek Road in Gloucester, Massachusetts (the "Wingaersheek Property") for $400,000. To fund the transaction, despite Mrs. Anderson's substantial assets, Allen obtained a $400,000 loan on behalf of Mrs. Anderson from Beverly National Bank, secured with a pledge of stock from the Revocable Trust. Allen executed the loan documents on behalf of Mrs. Anderson.

16.    Mrs. Anderson planned to build a house on the Wingaersheek Property, which was located next door to the Foundation's swimming pool facility. After purchasing the Wingaersheek Property, however, Conant and Allen advised Mrs. Anderson that she could not obtain the appropriate permitting to allow construction of a home on the site.

17.    Thereafter, in September 1994, Conant introduced to plaintiffs an interested buyer for the Wingaersheek Property, Deborah Caggiano.

18.    Conant arranged to sell the property to Mrs. Caggiano for $315,000, resulting in an $85,000 loss to the Foundation. The Purchase and Sale Agreement for the Wingaersheek

Property, dated September 1, 1994, provided that the purchase would be funded with a $6,000 deposit, $69,000 in cash at closing plus a $240,000 "1st mortage with lending institution." The closing was to take place six months later, on March 7, 1995. Conant thereafter agreed to extend the closing an additional seven months until October 1995. Conant has never accounted for the $69,000 cash deposit due at the closing.

19.    Instead of Caggiano financing the purchase through a lending institution and the Foundation receiving cash at the closing, however, Conant permitted Caggiano to sign a note to the Foundation in the amount of $240,000 at favorable terms (the "Caggiano Note"). Under the terms of the Caggiano Note, Caggiano was only obligated to make interest payments for the first twenty-two months at the rate of 8% per annum. In addition, Caggiano had the option to "renew the term of this Note for an additional year" if "Buyer has installed all underground utilities, a fully approved septic system; and completed the foundation work." Even with such favorable terms, the Caggiano Note was never paid off. Rather, in March 1998, Conant agreed to issue a new note (the "1998 Note") reflecting Caggiano's purported payments to date, forgiveness of one year of interest payments ($18,000) and extending the payment terms for an additional three years.

20.    Caggiano subsequently defaulted under the express terms of the Caggiano Note in July 1996 when she transferred the Wingaersheek Property to the Ocean View Realty Trust for $1 without notifying the Foundation as required under the Caggiano Note and related mortgage. If notified of the transfer, the Foundation had the right to immediately demand repayment. Furthermore, Caggiano secured the requisite permits and constructed a home on the Wingaersheek Property, contrary to Allen and Conant's advice to plaintiffs that home

8

construction was not allowed.

21.    In August 2001, without plaintiffs' knowledge, Conant filed a discharge of the mortgage on the Wingaersheek Property. Conant has never accounted for the amounts due under the Caggiano notes. In subsequent conversations, however, Conant stated that the purported interest paid from the notes was "extra" money, and should be used to fund an investment in a Vermont marble mine as described below.

22.    Conant committed professional malpractice by discharging the mortgage in August 2001 when at least $123,000 remained outstanding in principal alone. Indeed, this outstanding balance is reflected in the Foundation's 2001 financial statements, general ledgers, and tax returns signed by Conant.

### Conant's and Byor's Investment in a Non-Existent Marble Mine in Vermont

23.    In the late 1990s, Conant introduced Mrs. Anderson to another friend, former defendant John Byors. Conant identified Byors as a sculptor and owner of a marble mine in Vermont. Thereafter, Conant advised Mrs. Anderson to invest in Byor's marble mine and conspired with Byors to steal funds from plaintiffs through a series of phony loan transactions. On information and belief, Conant personally profited from the "loans" made to Byors. To date, plaintiffs have yet to locate any marble mine owned by Byors and do not believe it even exists.

24.    On or about June 14, 2001, Conant loaned $210,000 to former defendant John Byors, doing business as "Westside Marble." Conant prepared the loan documents for the marble mine investment. The loan to Byors was evidenced by a promissory note (the " $210k Note") and purportedly secured by a "chattel mortgage." Under the chattel mortgage, only a marble saw and 30 red marble blocks were pledged as security for the $210,000 loan.

9

25.    Under the terms of the $210k Note, Byors was obligated to repay the loan in one year with 15% interest. In addition to repaying the loan, Byors stated he would donate $1,000,000 to the Foundation:

> In addition to the payment of principal and interest as stated above borrower contemplates making charitable gifts to the lender in the amount of $200,000 per year for a minimum of five years beginning in 2002. This assumes that borrowers business is able to support such giving at that time.

26.    On January 15, 2002, Conant loaned to Byors an additional $250,000 for further investment in the marble mine. This second loan was again evidenced by a promissory note (the "$250k Note") and a chattel mortgage prepared by Conant. Under the chattel mortgage, only two saws and sixty-one black marble blocks secured the $250,000 loan.

27.    Under the terms of the $250k Note, Byors agreed to repay the loan within eighteen months at an interest rate of twenty percent. In connection with the $250k Note, Byors also committed to donate an additional $500,000 to the Foundation:

> In addition to the payment of principal and interest as stated above borrower contemplates making charitable gifts to the lender in the amount of $100,000 per year for a minimum of five years beginning in 2003. This assumes that borrowers business is able to support such giving at that time.

28.    The 210k Note was due and payable to the Foundation, plus interest, on June 14, 2002. On July 1, 2002, however, Conant permitted Byors to "extend" the maturity date to March 31, 2003 under the same terms and conditions. To secure the extension, Byors purportedly sold to the Foundation "three Red Marble Blocks being numbered 4, 13 and 16 respectively."

29.    Byors has defaulted under the terms of the $210k Note by failing to repay the loan by the extended maturity date of March 31, 2003. When questioned about the default, Conant stated that Byors was traveling in China and unavailable.

10

30.    The $250k Note matured by its terms on June 15, 2003. Byors also defaulted on the $250k Note.

31.    But for Conant's legal advice and counsel, plaintiffs would not have loaned funds to Byors. Conant committed professional malpractice in representing plaintiffs in connection with the Byors loan transactions. Indeed, no reasonable attorney acting in the best interest of and with undivided loyalty to his client would have condoned, let alone actively promoted and profited from, loans to Byors. In advocating the Byors' transactions, Conant committed professional malpractice, by, among other actions: (1) failing to disclose to plaintiffs that Byors was a longstanding client of Conant's (including defending Byors' various collection actions), and failing to receive written authorization waiving the conflict, including authorization to simultaneously represent both Byors and plaintiffs on both sides of the loan transaction; (2) failing to disclose to plaintiffs Byors' history of failed business enterprises, and multiple outstanding judgments against him; (3) failing to disclose to plaintiffs the existence of other individuals that had outstanding loans to Byors, and the potential of multiple claims against Byors in the event his "marble venture" failed; and (4) failing to disclose that Byors had no previous experience in operating a marble quarry, and in fact spent much of his career as a hair stylist.

32.    Apart from these blatant conflicts of interest, Conant himself apparently loaned money to Byors, which loans were outstanding when Conant recommended that plaintiffs loan money to Byors. In breach of his professional responsibilities and fiduciary duties, Conant failed to disclose this relationship to plaintiffs. Indeed, by failing to provide plaintiffs with written notice of the above conflicts, failing to recommend that the plaintiffs seek independent counsel,

11

and ultimately failing to obtain plaintiffs written consent, Conant engaged in prohibited

transactions under the Massachusetts Rules of Professional Conduct.

33.    The only documentary evidence of Conant's "loans" to Byors, which purportedly

total approximately $200,000, is an unsigned promissory note dated December 4, 2000, in the

face amount of $155,000. The unsigned note provides for no interest payments if repaid by

November 4, 2001. As an initial matter, it is difficult to fathom the legitimate business purpose

of an interest free loan to a client. Conant also has failed and/or refused to provide any

documentation demonstrating that Conant in fact funded these loans, either with his own money,

or money of others.

34.    Conant also committed professional malpractice in drafting the loan documents.

Among other things, Conant failed to adequately secure the loan, and failed to perfect a lien with

respect to the alleged "marble blocks" and "saws" – the only security provided for in the loan

documents. Conant also failed to require Byors to provide to plaintiffs financial statements, tax

returns or any business records at all so that Byors' activities could be monitored. Indeed, there

was not even a requirement in the loan documents that the loan proceeds be used in Byors'

"marble venture."

35.    The loan documents themselves were poorly drafted, riddled with errors, and

subject to attack by Byors in the event enforcement proceedings became necessary. Indeed,

Conant was unqualified to act as counsel in connection with Byors loan transactions. By means

of example only, the loan documents listed the wrong borrower, and even contained spelling

errors. Conant included an interest component that Byors later attacked as usurious, and a

bizarre "bonus" provision whereby Byors agreed to "donate" to the Foundation an additional

12

$1,500,000, above and beyond the loan amount, if his business could "support such giving" –
another provision later attacked by Byors. The provision was obviously included in the loan
agreement in an effort to fraudulently induce plaintiffs to enter into the loan transactions.

36.    Upon information and belief, Conant has engaged in similar loan transactions on
Byors' behalf, including loans with interest rates of 100%, without advising his clients, including
plaintiffs, of the need to register with the Massachusetts Attorney General's Office, if seeking to
charge an interest rate, which with all other charges and fees exceeds 20%.

37.    Conant's malpractice with respect to the Byors' transactions continued until he
was terminated by plaintiffs. Byors alleges that when the 210K Note became due on March 31,
2003, Conant gave Byors an indefinite extension of time within which to repay the loan. Conant,
however, failed to reduce the extension to writing, and also failed to negotiate any payment to
plaintiffs in exchange for the extension, or obtain any security for a loan that was already in
default.

38.    In addition to the 210K Note and the 250K Note, Conant committed professional
malpractice by transferring additional sums of money to Byors as "loans" from plaintiffs, for
which there is no written agreement, and no accounting. Despite repeated demands, Conant has
failed and/or refused to provide plaintiffs with a complete accounting of all funds transferred to
Byors.

39.    As a result of Conant's professional malpractice, and failure to adequately
represent plaintiffs' interest with respect to Byors, plaintiffs were forced to incur substantial legal
fees in an action to enforce the terms of the promissory notes against Byors, and were ultimately
forced to accept a less than optimal settlement due to the various defects in the loan documents,

13

the lack of security, and the "indefinite extension agreement," outlined above.

### Defendants' Mismanagement of Plaintiffs' Funds and Concealment Thereof

40.    As set forth above, defendants Allen, Sayre and Conant were trustees of Mrs. Anderson's Revocable Trust.   From the early to mid 1990's, the value of Mrs. Anderson's portfolio in the Revocable Trust averaged approximately $4,000,000, and Mrs. Anderson was able to live on the income from her trusts without substantially reducing the principal amount. After Conant gained control of plaintiffs' finances, however, Mrs. Anderson's purported "expenses" skyrocketed and the principal held in the Revocable Trust was rapidly depleted.

41.    Essex Street Associates, the custodian of the Revocable Trust, repeatedly warned Conant that Mrs. Anderson was literally "running out of money."  For example, by letter dated July 25, 2002, Conant was advised:

> [F]unds are leaving this office at the rate of $80,000/month between the Foundation and Hilda's personal needs.  Based on the enclosed schedule and the capital gains taxes generated as we raise cash to meet this outflow, she probably has a year left before her trust is tapped out. ...This is a very serious situation and seems to have gotten worse over the last year or two.

As a fiduciary to Mrs. Anderson with complete authority over her finances, Conant undoubtedly was aware of the precarious financial position in which he had placed plaintiffs.

42.    For several years, defendants Conant and Sayre met with Mrs. Anderson weekly. Despite their fiduciary responsibilities, however, and their constant contact, defendants never informed Mrs. Anderson either of the warnings of Essex Street Associates, or their own knowledge that the money would soon be depleted.  Mrs. Anderson was not made aware that any principal from her Revocable Trust was being eroded.

43.    In order for defendants to continue their misappropriation of funds and conceal

14

their breaches of fiduciary and contractual duties, Conant failed to make any quarterly tax payments owed by Mrs. Anderson in 2001 and made only one quarterly tax payment in 2002. As a result, Mrs. Anderson was assessed substantial tax penalties.

44. In approximately January 2003, Mrs. Anderson and her family learned for the first time that the Revocable Trust had been nearly exhausted. The family immediately demanded that Conant produce an accounting for the Foundation, Mrs. Anderson, and the Revocable Trust.

45. Conant, however, failed to cooperate. After several demands, Conant produced an eight-page "report" that was woefully incomplete and misleading.

46. Mrs. Anderson's family thereafter made multiple additional demands for financial information from Conant. Each request, however, was rebuffed and Conant failed and/or refused to turn over the requested information.

47. In March 2003, Mrs. Anderson terminated Conant's power of attorney. Even after his termination, Conant failed and refused to turn over all of Mrs. Anderson's and the Foundation's files in violation of the Massachusetts Rules of Professional Conduct. Finally, Mrs. Anderson's family went to Conant's law offices to retrieve their mother's files. Again, Conant rebuffed their efforts, and initially handed over only mixed up boxes of files from ten years ago, but no documents relating to Mrs. Anderson's current accounts. In April 2003, plaintiffs finally received from Conant's bookkeeper a ledger of Mrs. Anderson's account from January 2002 to the present and bank statements for only the past two years, but the turn over of documents by Conant is largely incomplete.

48. Additional client files in the possession of Conant may reveal further defalcations. Given Conant's lack of cooperation to date, plaintiffs are concerned that Conant may attempt to

destroy documents in his possession. Furthermore, Mrs. Anderson's former counsel, defendant

Allen, also may have client files in his possession that are necessary to complete an accounting.

### Conant's Professional Malpractice

49.    Conant was engaged as both the Foundation's attorney and Mrs. Anderson's

personal attorney, including assuming fiduciary responsibilities as the holder of a power of

attorney over Mrs. Anderson, trustee of her Revocable Trust, and the preparer and executor of

Mrs. Anderson's will and health care proxy. Conant also served as the manager and clerk of the

Foundation and proclaimed himself "in-house" counsel to the Foundation. Conant also had

signing authority over all checking accounts of Mrs. Anderson and the Foundation.

50.    Conant was retained by Mrs. Anderson as her legal counsel and fiduciary because

among other things, she required assistance in handling her financial affairs. Conant knew of

Mrs. Anderson's complicated medical and emotional history. Indeed, on at least one occasion,

Conant himself contacted Mrs. Anderson's psychiatrist to discuss her capacity to execute certain

trust documents. Despite this knowledge, Conant breached his professional responsibilities and

fiduciary duties by failing to properly advise and assist Mrs. Anderson during his representation.

51.    The General Durable Power of Attorney signed by Mrs. Anderson in favor of

Conant provided Conant with virtually unlimited power to act for Mrs. Anderson, including the

following:

- to modify, terminate, make deposits to and write checks on or make withdrawals from and grant security interests in all accounts in my name or with respect to which I am an authorized signatory;

- to transfer from time to time and at any time to the trustee or trustees of any Revocable Trust agreement created by me before or after the execution of this instrument, as to which trust I am, during my lifetime, a primary income and

principal beneficiary, any or all of my cash, property or interests in property, including any rights to receive income from any source . . . to direct the trustee or trustees to take such actions as my Agent shall deem appropriate.

- to represent me in all tax matters; to prepare, sign, and file federal, state, and/or local income, gift and other tax returns of all kinds, including joint returns, FICA returns, payroll tax returns, claims for refunds, requests for refunds, requests for extensions of time, . . .to pay taxes due, collect and make such disposition of refunds as my Agent shall deem appropriate;

- to employ, compensate and discharge such domestic, medical and professional personnel including lawyers, accountants, doctors, nurses, brokers, financial consultants, advisors, consultants, companions, servants and employees as my Agent deems appropriate.

52.    Conant was grossly negligent, committed professional malpractice and breached his fiduciary duties by failing to properly exercise his powers under the Power of Attorney.

53.    At all times, Conant was acting as plaintiffs' legal counsel and fiduciary responsible for, among other things, reviewing, authorizing, controlling, and paying for expenditures on behalf of Mrs. Anderson and the Foundation.

54.    Conant received monthly account statements showing the balance of assets in Mrs. Anderson's Revocable Trust. Conant also received monthly statements showing the balance of Mrs. Anderson's and the Foundation's checking accounts.

55.    In his role as plaintiffs' legal counsel, Conant maintained complete control over plaintiffs' expenses. During his tenure as legal counsel, Conant wrote over $8,000,000 in checks from plaintiffs' accounts. In sharp contrast, Mrs. Anderson rarely wrote a check over $400, and her personal check writing accounted for less than 10% of the expenditures from her accounts. Conant committed professional malpractice by failing to exercise any professional judgment, prudence, or management in writing checks and spending plaintiffs' funds, and acted as if

17

plaintiffs had unlimited resources. Conant failed to keep a budget of Foundation or personal expenses, failed to delineate between Mrs. Anderson's expenses and the Foundation's, failed to ensure that the Foundation spending was limited to Foundation affairs, and exercised no discretion to limit costs to a sustainable level.

56.    Although retained to do so, Conant also committed professional malpractice by failing to provide plaintiffs with any reasonable tax or estate planning advice. Instead, Conant hired a string of "bookkeepers" who had no interaction with Mrs. Anderson at all, and simply kept a running total of all expenditures, with no reconciliation to Conant's so-called "reserve" account, into which Conant pumped over $1,000,000 of plaintiffs' funds.

57.    As a result of Conant's professional malpractice and failure to execute any tax planning, Mrs. Anderson sustained unnecessarily large capital gains each year, caused by Conant's liquidation of her assets in the Revocable Trust. In 2002 alone, Mrs. Anderson incurred capital gains of over $900,000, as Conant drained her Revocable Trust of its last holdings. Conant never apparently understood the tax consequences of his actions, as those dollars were largely eaten up in taxes.

58.    Ironically, Conant himself has failed to file any income tax returns since 2000.

59.    While depleting Mrs. Anderson's Revocable Trust, Conant now claims he lacked such basic knowledge as the identity of the trustees, or even the operative trust agreement itself. In sum, charged to act in the best interest of his client, Conant was literally operating in the dark, and his professional malpractice and neglect caused plaintiffs' damages of several million dollars.

60.    Conant was woefully ill equipped to serve as the attorney and fiduciary for Mrs.

18

Anderson or her charity. Conant admits that his "primary practice area [is] handling real estate transactions, including . . . closing of residential real estate loans." Conant, a real estate closing lawyer, lacked the requisite knowledge, skill, thoroughness, and preparation reasonably necessary for his representation of plaintiffs, and never should have accepted the engagement to represent a non-profit foundation and act as counsel and fiduciary to Mrs. Anderson.

61.    Conant should have been acutely aware that his skill set did not match plaintiffs' needs. During his engagement with plaintiffs, Conant was in practice with Peter Cahill. In September 1994, Mr. Cahill was disbarred from the practice of law in Massachusetts for, among other things, improperly handling client funds.

62.    Conant's breach of obligations owed to his clients was stunning. Conant maintained no billing records, nor presented to plaintiffs bills for legal services rendered. Instead, Conant simply wrote out checks to himself for amounts he felt deserving. Conant likewise failed to institute a record keeping system of funds he held in trust for plaintiffs. Moreover, Mrs. Anderson's funds, were funneled through Conant's IOLTA account. A review of bank records reveals that Conant utilized his IOLTA account as a personal checking account. For example, Conant wrote checks from his IOLTA account to pay Byors' credit card bills, and to his wife, Pamela Conant.

63.    Conant also committed professional malpractice by failing to maintain complete records of the trust funds he held on behalf of plaintiffs in violation of Rule 1.15 of the Massachusetts Rules of Professional Conduct. Conant admits that he "maintained a reserve in his IOLTA to provide a convenient supply of readily available funds that could be used to cover the shortfalls in plaintiffs' account." Conant, however, failed to maintain accurate account

19

documentation, check registers, and/or individual client records concerning the deposits into his IOLTA account in violation of Rule 1.15.

64.    After Conant was terminated as counsel for plaintiffs, and after repeated demands, Conant finally turned over certain client documents, including the power of attorney executed in his favor, copies of the Irrevocable Trusts of which Mrs. Anderson was a beneficiary, and Mrs. Anderson's Revocable Trust and certain amendments thereto.  Conant, however, committed professional malpractice by failing to maintain adequate records of the Revocable Trust documents, including all amendments to the Revocable Trust.  Indeed, on information and belief, Conant was appointed as trustee of the Revocable Trust, replacing other prior appointed trustees. Due to Conant's negligent record keeping, however, this amendment was never turned over.

65.    In further violation of his professional duties, when plaintiffs demanded a full accounting, Conant refused.   Indeed, to this day, in response to interrogatories, Conant refuses to account either for the funds taken by him for legal services, or the funds held by him in his IOLTA account.

### Sayre's Abuse of his Position as Mrs. Anderson's Therapist and Professional Malpractice

66.    In violation of his ethical obligations, in breach of his fiduciary duties, and instead of acting as Mrs. Anderson's psychologist, Sayre apparently spent most of his time as Mrs. Anderson's concierge, running errands, cleaning the pool and performing undocumented "administrative services" for which he charged plaintiffs tens of thousands of dollars per year. Sayre also participated (and sought payment for) regular business meetings with the Andersons and Conant relating to Foundation matters.

20

67.    Sayre also took lavish gifts from plaintiffs, such as automobiles and cash payments, while securing for himself outrageous benefits, such as a $150,000 salary, free health care, credit card privileges and a $30,000 yearly pension. In short, Sayre breached the most fundamental canons of the doctor/patient relationship and took advantage of his patient's condition and lack of sophistication in financial matters.

### The Need for Prejudgment Security

68.    Based on the foregoing facts, plaintiffs are likely to obtain a judgment against defendants Conant and Sayre in an amount in excess of $5,000,000 plus attorneys' fees, accruing interest and costs. This debt is unsecured.

69.    Based upon defendants' wrongful conduct to date, there is a clear danger that assets will be dissipated if given advance notice of the requested prejudgment security remedies.

### COUNT I
#### (Conversion Against Conant)

70.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 69 above.

71.    Conant has intentionally and wrongfully exercised ownership, control or dominion over plaintiffs' property and funds, and converted those funds to his own use.

72.    As a result, plaintiffs have suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

### COUNT II
#### (Breach of Fiduciary Duty Against Conant)

73.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 72 above.

74.    Conant owed fiduciary duties to plaintiffs as a result of his roles as attorney in fact, trustee, and counsel to plaintiffs.

75.    As set forth above, Conant breached his fiduciary duties to plaintiffs by, among other actions, converting funds, self-dealing, gross mismanagement, and the failure to account for plaintiffs' funds.

76.    As a result, plaintiffs have suffered damages in an amount to be proven at trial plus interest, costs, attorneys' fees and further consequential damages.

## COUNT III
### (Fraud against Conant)

77.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 76 above.

78.    As set forth above, Conant has defrauded plaintiffs by, among other actions, converting funds, self-dealing, gross mismanagement, and the failure to account for plaintiffs' funds.

79.    As a result, plaintiffs have suffered damages in an amount to be proven at trial plus interest, costs, attorneys' fees and further consequential damages.

## COUNT IV
### (Breach of Contract Against Conant and Sayre)

80.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 79 above.

81.    Conant and Sayre have breached the terms of the trust agreements entered into for the benefit of Mrs. Anderson.  Furthermore, as the attorney for Mrs. Anderson and the Foundation, Conant owed plaintiffs the contractual duty to render honest and competent legal

22

representation.

82.     As a result of Conant's and Sayre's breaches of contract, plaintiffs have suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

COUNT V
(Negligence Against Conant)

83.     Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 82 above.

84.     As set forth above, Conant served as attorney in fact for Mrs. Anderson, trustee, and legal counsel to both Mrs. Anderson and the Foundation and owed plaintiffs a duty to exercise care.

85.     Conant committed professional malpractice in his role as plaintiffs' attorney, trustee, power of attorney, and the Foundation's "in house" counsel, manager and clerk by, among other things, breaching the fiduciary duties he owed to the plaintiffs; failing to properly exercise his fiduciary duties under the power of attorney; failing to budget, delineate or limit expenses to a sustainable level or exercise any professional judgment in writing checks and spending plaintiffs' funds; failing to provide any reasonable tax or estate planning advice; improperly discharging the Caggiano loan; failing to maintain any billing records for services rendered; failing to properly maintain client files or records of trust funds; and representing plaintiffs and Byors in the Byors' loan transactions.

86.     Conant was woefully ill equipped to serve as the attorney and fiduciary for Mrs. Anderson or her charity.  Conant, a real estate closing lawyer, lacked the requisite knowledge,

23

skill, thoroughness, and preparation reasonably necessary for his representation of plaintiffs, and was in over his head in representing a non-profit foundation and acting as counsel and fiduciary to Mrs. Anderson.

87.    As a result, plaintiffs have suffered damages in an amount to be proven at trial plus interest, costs, attorneys' fees and further consequential damages.

COUNT VI
(Breach of Fiduciary Duty Against Sayre)

88.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 87 above.

89.    Sayre owed fiduciary duties to the plaintiffs.

90.    Sayre breached the fiduciary duties owed the plaintiffs by, among other actions, self-dealing, including arranging for compensation to himself of approximately $200,000 per year, converting funds, gross mismanagement, and the failure to account for plaintiffs' funds.

91.    As a result, plaintiffs have suffered damages in an amount to be proven at trial plus interest, costs, attorneys' fees and further consequential damages.

COUNT VII
(Fraud Against Sayre)

92.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 91 above.

93.    As detailed above, Sayre defrauded the plaintiffs by, among other actions, self-dealing, including arranging for compensation to him of approximately $200,000 per year, converting funds, gross mismanagement, and the failure to account for plaintiffs' funds.

94.    As a result, plaintiffs have suffered damages in an amount to be proven at trial

24

plus interest, costs, attorneys' fees and further consequential damages.

## COUNT VIII
### (Negligence Against Sayre)

95.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 94 above.

96.    Sayre owed Mrs. Anderson a duty to exercise professional care.

97.    Sayre breached that duty of care by, among other actions, self-dealing, including arranging for compensation to him of approximately $200,000 per year, converting funds, gross mismanagement, and the failure to account for plaintiffs' funds.

98.    As a result, plaintiffs have suffered damages in an amount to be proven at trial plus interest, costs, attorneys' fees and further consequential damages.

## COUNT IX
### (Declaratory Judgment Against Sayre)

99.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 98 above.

100.   There is an actual controversy between plaintiffs and Sayre as to Sayre's entitlement to the past, present and future payments made to him.

101.   Plaintiffs seek a declaration voiding all payments, and an order requiring that Sayre disgorge such payments for the benefit of plaintiffs, or pay as damages an amount equal to the sum disgorged.

## COUNT X
### (Unjust Enrichment against Conant and Sayre)

102.   Plaintiffs repeat, reallege and incorporate by reference herein the allegations

25

contained in paragraphs 1 though 101 above.

103.    Defendants were not entitled to the payments taken from plaintiffs.

104.    Plaintiffs are entitled to restitution of all sums by which defendants have been unjustly enriched.

COUNT XI

(Violations of M.G.L. c. 93A, Sections 2 and 11 against Conant and Sayre)

105.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 104 above.

106.    At all relevant times, Conant and Sayre and the Foundation were engaged in trade or commerce within the meaning of M.G.L. c. 93A.

107.    As set forth above, Conant and Sayre have each committed knowing and willful violations of M.G.L. c. 93A against the Foundation.

108.    Defendants' unfair and deceptive acts or practices conduct occurred in the Commonwealth of Massachusetts.

109.    As a result, the Foundation has suffered and continues to suffer loss of money or property in an amount to be proven at trial plus interest, costs, attorneys' fees and further consequential damages.

COUNT XII

(Aiding and Abetting Liability Against All Defendants)

110.    Plaintiffs repeat, reallege, and incorporate by reference herein the allegations contained in paragraphs 1 through 109 above.

111.    As set forth above, each of the defendants had knowledge of, and personally participated in the conversions, breaches of fiduciary duties, breaches of trust and fraud set forth

26

above.

112.    Each of the defendants provided substantial assistance to the formulation and implementation of the scheme to defraud the plaintiffs, with knowledge that such scheme was part of a common tortious plan.

113.    As a result, plaintiffs have suffered damages in an amount to be proven at trial plus interest, costs, attorneys' fees and further consequential damages.

COUNT XIII<br>(Accounting Against All Defendants)

114.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 113 above.

115.    Mrs. Anderson and the Foundation are entitled to a formal accounting of their funds and assets from each of the defendants.

COUNT XIV<br>(Trustee Process and Reach and Apply Against Conant and Sayre)

116.    Plaintiffs repeat, reallege and incorporate by reference herein the allegations contained in paragraphs 1 though 115 above.

117.    Defendants Conant and Sayre maintain bank accounts at one or more of the following banks:  Sovereign Bank, Beverly National Bank, Ipswich Bank, Fleet Bank, Citizens Bank, First and Ocean National Bank, and Rockport National Bank.

118.    Pursuant to M.G.L. c. 246, § 1, plaintiffs are entitled to trustee process the bank accounts and apply them to satisfy plaintiffs' likely judgment against defendants.

119.    In addition, plaintiffs are entitled to reach and apply Sayre's interest in the split dollar agreement, established at New England Life Insurance Company, and funded by the

27

Foundation.

## REQUESTS FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

A. Order, on an ex parte basis, a trustee process attachment in the amount of $5,000,000, against the goods, effects and credits of Conant, held by Sovereign Bank, Beverly National Bank, Ipswich Bank, Fleet Bank, Citizens Bank, First and Ocean National Bank, Rockport National Bank, and/or Eastern Bank;

B. Order, on an ex parte basis, a general attachment on all real property standing in the name of Conant, or his nominees, in Essex County in the amount of $5,000,000;

C. Order, on an ex parte basis, a trustee process attachment in the amount of $5,000,000, against the goods, effects and credits of Sayre, held by Sovereign Bank, Beverly National Bank, Ipswich Bank, Fleet Bank, Citizens Bank, First and Ocean National Bank, and Rockport National Bank;

D. Order, on an ex parte basis, that New England Life Insurance Company, its officers, directors, shareholders, agents, servants, employees, attorneys, pledgees, nominees, successors and assigns be restrained and enjoined from conveying, transferring, alienating, selling, hypothecating, encumbering, disposing or paying any accounts, payables or other sums, amounts, income or funds to or for the benefit of the defendant Sayre up to the amount of $5,000,000;

E. Order, on an ex parte basis, a general attachment on all real property standing in the name of Sayre, or his nominees, in Essex County in the amount of $5,000,000;

F. Order, on an ex parte basis, that Conant, Sayre, and their nominees, agents, attorneys, successors and assigns, and all persons with actual knowledge of this order, be restrained from selling, alienating, transferring and/or otherwise disposing of any of their assets;

G. Under Counts I though V, enter judgment in favor of plaintiffs and against Conant, in an amount to be proven at trial, plus consequential damages, accruing interest, attorneys' fees, costs and other expenses;

H. Under Counts IV and VI through VIII, enter judgment in favor of plaintiffs and against Sayre, in an amount to be proven at trial, plus consequential damages, accruing interest, attorneys' fees, costs and other expenses;

I. Under Count IX, declare that plaintiffs have no obligation to make any further payments to Sayre, and that he be required to disgorge all payments and benefits received by him;

J.  Under Count X, award plaintiffs restitution damages against Conant and Sayre;

K.  Under Count XI, award plaintiffs multiple damages and attorneys' fees against Conant and Sayre;

L.  Under Count XII, enter judgment in favor of plaintiffs and against all defendants, including Allen, in an amount to be proven at trial plus consequential damages, accruing interest, attorneys' fees, costs and other expenses;

M.  Under Count XIII, against all defendants, order an accounting of all funds and assets held of plaintiffs;

N.  Under Count XIV, apply all secured cash and non-cash accounts to satisfy plaintiffs' judgment against defendants; and

O.  Award such other relief to the plaintiffs that is just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE

DATED: May 2?, 2004

Hilda Ayer Anderson and
The Ayer-Anderson Foundation, Inc.

By their attorneys,

Joel G. Beckman BBO# 553086
William C. Nystrom BBO#559656
Colleen C. Cook BBO#636359
Nystrom Beckman & Paris LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 779-9110 (fax)

29

## CERTIFICATE OF SERVICE

I, Joel G. Beckman, hereby certify that on May 2#, 2004, I caused a true copy of the foregoing document to be served by first class mail upon all counsel of record.

Joel G. Beckman

30